70 F.3d 117
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Diane L. STAPLETON, Defendant-Appellant.
 No. 95-2195.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 3, 1995.
Decided Nov. 9, 1995.
 
 Before CUMMINGS, ESCHBACH and ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Diane Stapleton ("Stapleton") pleaded guilty to manufacturing methcathinone, a controlled substance, in violation of 21 U.S.C. Sec. 841(a)(1). She claims that the district court erred by failing to limit her relevant conduct to one batch of methcathinone that she produced with Katherine Jeske in December 1992. Thus she contends that she should have been sentenced on the basis of that batch, which the district court found to produce 1.5 ounces of methcathinone, instead of the 50 ounces that the court used to calculate her sentence. We affirm.
 
 
 2
 On March 2, 1995, Stapleton waived formal indictment and, pursuant to a plea agreement, pleaded guilty to manufacturing a controlled substance during December 1992. 21 U.S.C. Sec. 841(a)(1); 21 C.F.R. 1308.11(f). At sentencing, Stapleton objected to the use of other instances of drug manufacture as part of her relevant conduct. After entertaining argument from both sides, the district court considered some of Stapleton's methcathinone-related activities prior to December 1992 to be relevant in general. It calculated the relevant drug quantity by relying upon instances of manufacturing from December 1992 through July 1993.
 
 
 3
 In the fall of 1991, Stapleton became a user of methcathinone. In the summer of 1992, Robert Stapleton, her husband, and his step-brother Ron Stapleton became partners in manufacturing this drug. According to Robert Stapleton, the defendant soon began to assist him. Stapleton herself told Special Agent Sperry that she was first present during the manufacturing process in or about August or September 1992 in Nelma, Wisconsin. In November 1992, Stapleton's husband manufactured the drug at least four times and made twenty sales. Peter Hansen, who appears to have been Jeske's boy friend,[1] also manufactured quantities of this drug at Stapleton's home. The district court did not include drug production or sales of November 1992 in determining the quantity of methcathinone for sentencing purposes because it found that Stapleton had merely been present.
 
 
 4
 Based on the facts in the PSR, the district court found that during and after December 1992, Diane Stapleton was responsible for a total of 13-15 batches of methcathinone, which yielded between 43.5 to 57.5 ounces combined. The district court found that batches after December 1992 constituted relevant conduct both because they were close in time to the December 1992 offense and because the same drug was manufactured under the same or similar circumstances throughout. The court divided the relevant drug quantities into four transactions or sets of transactions.
 
 
 5
 First, the court counted the defendant's activities with Katherine Jeske in December 1992 as one batch producing 1.5 ounces. At some point during that month, Stapleton visited her husband, who was confined in the Iron County Jail for three weeks, and met Jeske, who was visiting her boyfriend. Jeske and Stapleton agreed to manufacture methcathinone. In the basement of her own home in Phelps, Wisconsin, Stapleton assisted Jeske in setting up the equipment and left. Jeske used the Stapletons' supplies, including Robert Stapleton's chemicals. After three or four hours, Stapleton returned. Jeske gave an eighth of an ounce of the product to Stapleton and sold the rest to raise bond money for her boyfriend. Stapleton's subsequent Caspian, Michigan, methcathinone-related activities with Jeske in or around February 1993 were not included in the drug quantity calculation. However, during February, she was arrested and convicted after a police officer spotted Jeske and the defendant ingesting methcathinone in a parking lot in Florence, Wisconsin. This incident was deemed part of her relevant conduct, and therefore the conviction was not included in assessing her criminal history category.
 
 
 6
 Second, the court included quantities manufactured with Robert Stapleton, his step-brother David Stapleton and David's wife Danette. After Robert was released from jail, he and the other two moved into the defendant's home. During the following month, all four people worked together to make three batches, which yielded eight to twelve ounces of methcathinone combined. The defendant and Danette Stapleton assisted in the manufacturing process by "drying the epsom salt and washing various jars which were utilized in the manufacture." (PSR p 21.)
 
 
 7
 Third, the court included quantities produced by the partnership of Robert Stapleton and John Stapleton. (His relationship to Robert is unclear.) From January 1993 through May 1993, they produced five to six batches of methcathinone, which yielded a total of twenty to twenty-four ounces. Stapleton and her husband split the proceeds in half with John Stapleton.
 
 
 8
 Fourth and finally, Robert and Diane Stapleton together produced five batches, which yielded approximately fourteen to twenty ounces. Robert Stapleton stated in general that his wife acted as his partner and that she had participated in his drug activities by "squeezing some of the products which were required during the manufacturing process and cleaning various jars," by obtaining supplies and by selling the product. (PSR paragraphs 13, 37; see R. 19 at 23-24.) The couple made most of these batches at their residence in Phelps, Wisconsin, although they manufactured some methcathinone in and around June 1993 in a cabin owned by William Cataldo's parents. Although the PSR does not directly indicate whether any of these batches were made prior to December 1992, Stapleton did not move into the house in Phelps, Wisconsin until that month.[2]
 
 
 9
 The court arrived at a final quantity of 50 ounces of methcathinone, which yielded a base offense level of 28. The court awarded a three-point downward adjustment for the acceptance of responsibility, but it declined to make a downward departure on the basis of exceptional family circumstances. The combination of an adjusted base offense level of 25 and a criminal history category of I yielded a sentencing range of 57 to 71 months and a supervised release range of three to five years. The court sentenced Stapleton to 60 months in prison and five years of supervised release. According to the probation office, if Stapleton's relevant conduct was limited to the December 1992 incident, she would have had a criminal history category of II, and her guideline range would have been from 15 to 21 months.
 
 
 10
 Under Sec. 1B1.3(a)(2) of the sentencing guidelines, relevant conduct includes acts or omissions committed in relation to other uncharged transactions that are attributable to the defendant, see id. (citing guidelines subsection 1B1.3(a)(1)(A), (B)), if (1) assuming that she had been charged and convicted of the other transactions, these transactions would be grouped together with the offense of conviction, and (2) these transactions and the offense of conviction constitute a "course of conduct" or "common scheme or plan." See also Sec. 1B1.3, comment. (n. 3). Stapleton appears to concede in her reply brief that "[c]ertainly, everything Stapleton allegedly did with her husband involving methcathinone was part of a course of conduct or a common scheme...." (Reply Br. at 4.) However, she argues that manufacturing drugs with Jeske constitutes a separate, unrelated offense that does not merit aggregation with this uncharged course of conduct. "The determination that uncharged activity constitutes 'relevant conduct' under section 1B1.3(a)(2) is a finding of fact, which we will not disturb unless it is clearly erroneous." United States v. Sykes, 7 F.3d 1331, 1335 (7th Cir.1993). "A factual finding is clearly erroneous 'when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.' " Id. (citations and internal quotation marks omitted).
 
 
 11
 If Stapleton had been charged and convicted of the other instances of manufacturing or conspiring to manufacture methcathinone, all such counts would have been grouped together pursuant to Sec. 3D1.2 and Guideline Sec. 2D1.2. U.S.S.G. Sec. 3D1.2(d). However, Stapleton contends that the district court improperly focused upon Sec. 3D1.2 as a substitute for a "course of conduct." She correctly points out that finding that the offense of conviction and the uncharged conduct could be grouped together is a necessary, but not sufficient condition for the application of Sec. 1B1.3(a)(2). United States v. Darmand, 3 F.3d 1578, 1581-1582 (2d Cir.1993). "Offenses of the same kind, but not encompassed in the same course of conduct or plan, are excluded." United States v. White, 888 F.2d 490, 499 (7th Cir.1989). However, despite the district court's failure to expressly state that it found either a "course of conduct" or a "common scheme or plan," the court's analysis, which addressed similarity and geographic and temporal proximity, paralleled the government's arguments that these various methcathinone transactions constituted a course of conduct.[3] The district court adequately articulated the necessary relationship between the offense of conviction and the other activities as a course of conduct.[4]
 
 
 12
 "Course of conduct" and a "common scheme or plan" are similar, but not equivalent concepts. U.S.S.G. Sec. 1B1.3, comment. (n. 9). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose or similarity of modus operandi. Id. "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." Id. Relevant factors in deciding whether two or more transactions constitute a course of conduct include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." Id.; Garcia, No. 94-3141, 1995 WL 554620, at * 9 (considering the " 'similarity, regularity and temporal proximity of the incidents in question.' ") (quoting United States v. Cedano-Rojas, 999 F.2d 1175, 1180 (7th Cir.1993)).
 
 
 13
 The district court properly found temporal and geographic similarity. The instances of drug manufacturing between August 1992 and June or July 1993 are close enough in time to support finding a single course of conduct. Cf. United States v. Montgomery, 14 F.3d 1189, 1198 (7th Cir.1994); United States v. Cedano-Rojas, 999 F.2d 1175, 1180-1181 (7th Cir.1993) (upholding finding of single course of conduct even though activity ceased for two years). Prior to December 1992, Stapleton moved from Nelma, Wisconsin, where she was first present during the manufacturing process, to Ironwood, Michigan, and then back to Nelma, Wisconsin. During this period, the only instances of manufacturing for which the Presentence Investigation Report provides a location occurred in Nelma, Wisconsin. In December 1992, she moved to Phelps, Wisconsin, which is less than fifteen miles from Nelma. Rand McNally's 1995 Road Atlas: United States-Canada-Mexico at 106-107 (1995). The offense of conviction occurred in this home. This place was the site of every batch after December 1992 for which the Presentence Investigation Report provides a location, except for the batch that Stapleton watched Jeske manufacture in Caspian, Michigan, in February 1993 and the batches made at William Cataldo's cabin. Every ounce of methcathinone included in the drug quantity, except for the four ounces produced at the cabin, was manufactured in Stapleton's home.
 
 
 14
 The district court did not separately address the issue of regularity. Although if performed at an average rate, the repeated batches would be frequent, the Presentence Investigation Report presents them as groups over a period of months. This method makes the determination of regularity difficult at best. See also Sykes, 7 F.3d at 1335 (defining regularity in relation to "common scheme or plan" as repeated acts that take place at fixed intervals or according to consistent or periodical rule or practice). However, even if this factor is deemed absent, a stronger showing of one or more of the other factors may compensate for the absence. Sec. 1B1.3, comment. (n. 9); cf. Garcia, No. 94-3141, 1995 WL 554620, at * 9 (saying that even without temporal proximity or regularity, a stronger showing of similarity may suffice). Since Stapleton appears to concede that her activities with her husband both before and after she manufactured methcathinone with Jeske constitute a single course of conduct, concerns over the regularity of the other transactions are not as strong as they might otherwise be.
 
 
 15
 Stapleton focuses her arguments on the dissimilarity of the Jeske incident and the transactions involving her husband and others. "To determine whether acts are sufficiently similar for the purposes of sec. 1B1.3, 'a court must look to the identity of the participants and their roles in the events at issue, as well as the nature, structure and location of the allegedly related transactions.' " Garcia, No. 94-3141, 1995 WL 554620, at * 9 (citation omitted). " '[I]t is not enough that the extraneous conduct merely amounts to the same offense as the offense for which the defendant was convicted.' " Sykes, 7 F.3d at 1335. First, Stapleton points out that she was the only common participant in the offense of conviction and the other transactions with her husband and others that were used to calculate the drug quantity. Furthermore, the record contains no evidence of any particularly distinctive method of manufacturing the substance. However, Stapleton's arrangement with Jeske shares a number of common features with the ongoing series of offenses with Stapleton's husband. The defendant typically permitted the use of her home and provided minor manual labor, while someone else, whether it be her husband, Jeske or some other individual, did the cooking. Jeske used the same chemicals and supplies that Stapleton and her husband had on hand for their manufacturing. Stapleton turned to Jeske when her husband was unavailable. In effect, Jeske may be viewed as a substitute chef in Stapleton's ongoing manufacturing efforts in her Phelps, Wisconsin, home.
 
 
 16
 Stapleton contends that the Jeske incident had a key distinguishing feature: motive. According to the PSR, "[t]he defendant states that her motivation for her involvement in the offense was to be with her husband, to make money to help with financial problems, and to have access to methcathinone." (PSR p 40.) As she had argued in her written objection to the PSR and at sentencing, Stapleton claims that the December 1992 transaction was sparked by a humanitarian desire to help Jeske and her boyfriend. The government contends that the same motives run throughout the single course of conduct, i.e., personal gain and access to the drug for personal use. Although these motives are not particularly distinctive, they are also not mutually exclusive with a desire to help Jeske. Even so, receiving an emotional benefit in addition to accepting a share of methcathinone is not sufficient to distinguish this instance from the other instances of methcathinone manufacturing.
 
 
 17
 This court does not sit as the initial finder of fact in this case. Instead, we must defer to the district court's finding of a course of conduct unless that finding is clearly erroneous. The court did not commit clear error by finding that Stapleton's activities with her husband constituted relevant conduct for the December 1992 offense. The finding was permissible, although not inevitable. Stapleton's arrangement with Jeske may be viewed as the acquisition of a substitute chef during the period of Robert Stapleton's unavailability in order to continue her "ongoing series of offenses." Sec. 1B1.3, comment. (n. 9).
 
 
 18
 Stapleton pleaded guilty to a peripheral part of her course of conduct. The resulting expansion of the drug quantity from 1.5 ounces to 50 ounces is a matter of concern. See United States v. Beler, 20 F.3d 1428, 1431 (7th Cir.1994) (discussing seemingly unfair, albeit permissible expansion of relevant conduct). However, in her plea agreement, Stapleton reserved the right to dispute the calculation of her sentence, and she has done so. The district court adequately set forth the necessary relationship between the unconvicted activity and the charged offense, and its finding is not clearly erroneous.
 
 
 19
 The judgment and conviction order is affirmed.
 
 
 
 [1]
 The Presentence Investigation Report refers to Jeske's boyfriend as "Peter Hansen" (PSR p 19), or "Peter Goetsch" (PSR p 39)
 
 
 [2]
 At an unknown date (the PSR lists it after the December 1992 incident), Stapleton received a quarter ounce of methcathinone from Peter Hansen as payment for the use of her home to manufacture a batch of the drug. It does not appear to have been included in the drug quantity
 
 
 [3]
 After first providing a paraphrase of Sec. 1B1.3(a)(2), in which it mentioned the course of conduct or common scheme or plan requirement, and then addressing the Sec. 3D1.2 grouping issue, the district court stated:
 And so then we look to that conduct. Ms. Stapleton with Ms. Jeske and Mr. Stapleton did about the same thing. She assisted in the manufacture of methcathinone and provided certain ingredients therefor, toluene being one. Did it within a relatively brief period, at least from sometime prior to December of 1992 through June or July of 1993. Did involve herself with the manufacture of methcathinone. Did do that at her own residence for the most part. Did provide those same functions for the manufacture thereof.
 The Court has no difficulty in determining that the acts are as described in (1)(A), the acts were committed by the defendant. There, of course, does not have to be another application note. There does not have to be a jointly undertaken criminal activity alleged. It's a criminal plan, it's a scheme, it's an endeavor undertaken by the defendant in concert with others, whether or not charged as a conspiracy which is Application Note 2.
 .... [I]t seems to the Court that we could have concluded this hearing within 15 minutes if there would be a brief reference to the undertaking between this defendant, Jeske and Stapleton, point out the particular paragraphs, the particular incidents, December of '92 through June of 1993, and that's all there is to it.
 (R. 19 at 27-28.) The latter part of the second paragraph appears to directly paraphrase Sec. 1B1.3, comment. (n. 2), which the probation officer quoted in his response to Stapleton's objection. (Cf. PSR at 24.) The discussion relates to whether the other acts could be directly or indirectly attributed to the defendant. See Sec. 1B1.3(a)(2) (citing subsection (a)(1)(A), (B)).
 
 
 [4]
 "[A] district court should explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activity bore the necessary relation to the convicted offense." United States v. Duarte, 950 F.2d 1255, 1263 (7th Cir.1991), certiorari denied, 113 S.Ct. 174. However, where the district court was clearly applying the analysis and simply omitted the words "course of conduct," we will not reverse. See United States v. Thomas, 969 F.2d 352, 355 (7th Cir.1992) (upholding district court's decision based on inadequately expressed findings because district court clearly adopted a government's rationale and PSR provided sufficient factual support), certiorari denied, 113 S.Ct. 274; cf. also United States v. Garcia, No. 94-3141, 1995 WL 554620, at * 10 (7th Cir. Sept. 19, 1995) (holding that district court did not need lengthy discourse on meaning of "same course of conduct" in order for its brief statement of reasons to be clear)