UNITED STATES of America,
Plaintiff–Appellee,

v.

Randy L. McENTIRE and Mark R. Wilkins, SR., Defendants–Appellants.

Nos. 96–3973, 96–3470.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 2, 1997.

Decided Aug. 11, 1998.

Randy G. Massey (argued), Office of U.S. Atty., Criminal Div., Fairview Heights, IL, for U.S.

James F. Haffner (argued), Sexton & Haffner, St. Louis, MO, for Randy L. McEntire.

John J. O'Gara, Jr., Belleville, IL, James F. Haffner (argued), Sexton & Haffner, St. Louis, MO, Mark R. Wilkins.

Before HARLINGTON WOOD, JR., COFFEY, and FLAUM, Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.

Defendants Randy L. McEntire and Mark R. Wilkins, Sr., appeal the sentence each received after pleading guilty to one count for conspiracy to distribute methamphetamine. Both challenge the type and the quantity of methamphetamine used by the district court judge in calculating the base offense levels under the Sentencing Guidelines. Because of the nature of the issues involved, a more detailed factual and legal review is required.

## I. BACKGROUND

On January 20, 1995, Defendants Randy L. McEntire ("McEntire") and Mark R. Wilkins, Sr. ("Wilkins"), along with twelve other defendants, were charged in a three-count [1] indictment returned by a grand jury sitting in the Southern District of Illinois. Count I charged the defendants with conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and § 846. Count III was a forfeiture allegation pursuant to 21 U.S.C. § 853(p). On November 20, 1995, a superseding indictment was returned. The charges remained the same but four more defendants were added under Counts I and III.

Both defendants pleaded guilty to Count I, admitting that from June 1992 to January 1995, eighteen defendants, including McEntire and Wilkins, were members of a conspiracy to distribute large quantities of methamphetamine. Both McEntire and Wilkins also admitted to the forfeiture allegations.[2]

---

1. Count II did not pertain to the two appellants.

2. The forfeiture count against Wilkins was later dismissed by the government.

McEntire and Wilkins entered separate Stipulations of Facts and Plea Agreements.

McEntire stipulated that, on occasion, he not only accompanied Don Skaggs ("Skaggs"), the primary distributor, to California and Nevada to acquire methamphetamine but that he, McEntire, was a distributor of the methamphetamine in Missouri. In McEntire's plea agreement, the government stated that it believed McEntire's relevant offense conduct involved in excess of 30 kilograms of a mixture or substance containing methamphetamine,[3] resulting in an initial Guideline offense level of 38. McEntire contested the amount assumption in his plea agreement, the presentence report, and the sentencing hearing. He stated in his objections to the presentence report that the amount of methamphetamine he received was between 40 to 50 pounds, placing his relevant conduct in excess of 10 kilograms but less than 30 kilograms, resulting in a base offense level of 36. McEntire agreed with the government that, having accumulated nine points from previous convictions, his Criminal History Category under the Sentencing Guidelines was IV, which was later amended to level V when additional convictions were discovered.[4] His agreement also stated that the government would recommend that McEntire receive a recommendation for a reduction of three levels due to his recognition and acceptance of personal responsibility for his conduct in the conspiracy. The government also agreed to recommend a sentence to the low end of the range ultimately determined by the court.

Wilkins stipulated to the fact that he acted as a courier and stash house operator. Detailing five separate drug transactions, the government calculated that from October or November of 1992 through June of 1994, Wilkins, as part of the conspiracy, was directly involved in handling between 22+ to 24 pounds of a mixture or substance containing methamphetamine, which would result in a base offense level of 36. Wilkins did not contest this assumption in his plea agreement but did object to that amount in the presentence report. The government stated in the agreement that Wilkins had acquired two criminal history points from previous convictions and that his Criminal History Category under the Sentencing Guidelines was II. The government also agreed that Wilkins receive a recommendation for a reduction of three levels due to his recognition and acceptance of personal responsibility for his conduct in the conspiracy and recommended a sentence to the low end of the range ultimately determined by the court.

Both McEntire and Wilkins' plea agreements were non-cooperating agreements which specifically stated that there was no agreement as to what the sentence would be nor as to what quantity of methamphetamine constituting each defendant's relevant conduct would be. McEntire's formal plea of guilty was entered on June 7, 1996. Wilkins' formal plea was entered on June 28, 1996. Both were sentenced under the United States Sentencing Commission Guidelines ("U.S.S.G.") (Nov. 1, 1994), due to the fact that all of the offenses occurred prior to February 1995.

## A. McEntire's Sentencing Hearing

Formal sentencing hearings for McEntire were held on September 6, September 25, and September 27, 1996. One of the co-defendants who testified was Don Skaggs. Skaggs and his wife, Sherie, seemed to be the central figures of the conspiracy. Skaggs testified at another co-defendant's trial that he, Skaggs, was the "kingpin" of the conspiracy. Skaggs stated that various co-defendants served as couriers, transporting the methamphetamine from California to the Skaggses' residence in Granite City, Illinois. The Skaggses also traveled to Nevada and California to obtain methamphetamine and then returned to distribute the drugs to other coconspirators in the Granite City area

---

**3.** The government believed that the entire conspiracy involved between 150 and 300 pounds of methamphetamine during the two and one-half year period and that McEntire was a major distributor in Missouri. The government contends, at a minimum, he was responsible for more than 30 kilograms, or approximately 66 pounds, of methamphetamine.

**4.** McEntire contested his criminal history points in his Objections to Pre–Sentencing Report but does not raise this issue on appeal.

and in Missouri. Skaggs estimated at the hearing that he personally had received between 130 to 180 pounds of methamphetamine.

Skaggs originally gave a proffer on August 21, 1995, stating that he personally had received 150 pounds of methamphetamine and that he had supplied McEntire with 50 pounds. He then testified at a codefendant's trial that he provided McEntire with between 80 to 100 pounds of a mixture or substance containing methamphetamine for redistribution. Skaggs next signed an affidavit which stated that "I have no real knowledge or accurate estimate as to the amount of methamphetamine I supplied to Randy McEntire." The affidavit was presented into evidence at the sentencing hearings. According to Skaggs' testimony at the sentencing hearing, for a period after the co-defendant's trial, Skaggs and McEntire were bunkmates in the same county jail. Skaggs stated that McEntire discussed with him the fact that Skaggs had testified the poundage sold to McEntire was 80 to 100 pounds, and McEntire had said that he only bought about 40 pounds from Skaggs. Skaggs stated that McEntire asked him to write a statement that the 80–to–100–pound estimate was incorrect. Skaggs then testified at the hearing that, if anything, his earlier testimony that he sold McEntire 80 to 100 pounds of methamphetamine was conservative or low.

Skaggs testified to a specific occasion when he and McEntire traveled to Las Vegas to obtain four pounds of methamphetamine. Skaggs also stated that on two specific occasions he received $30,000 from McEntire as payment for two pounds of methamphetamine and on "many" occasions, Skaggs said he received $10,000 to $20,000 from McEntire. Skaggs testified that he started selling to McEntire from May 11, 1992, when McEntire was released from prison, and that he did a series of deals with McEntire that summer, each approximately two weeks apart, but sometimes twice a week. On cross-examination, the defense enumerated seven deals with McEntire between McEntire's release date and July 4th.

Skaggs also testified that he, personally, used "a lot" of methamphetamine, in addition to using other drugs, and that it sometimes affected his memory. He also stated that he had previously lied to the authorities in order to benefit himself.

Bradley Leger, another co-defendant, testified at McEntire's sentencing hearing that after Skaggs and McEntire's regular supplier was incarcerated, he became their supplier from June or July 1994 to December 1994. He stated that on nine different occasions he personally supplied methamphetamine to McEntire. The first transaction was in 1994 when Leger delivered a three-pound package to one of McEntire's couriers who had come to California. The courier was apprehended and the contents were tested. The second exchange was when McEntire told Leger to mail a two-pound package of methamphetamine to be received by a third party for McEntire. This package was intercepted by the government and its contents analyzed. The third and fourth occasions were two trips McEntire made to California with a girlfriend to obtain a one-pound package on each trip. The fifth and sixth transactions occurred when Leger sold a two-pound package on two different occasions to one of McEntire's couriers. The seventh exchange occurred when Leger delivered a two-pound package to McEntire in Missouri. The eighth was another two-pound package delivered directly to McEntire in Missouri. The total amount of methamphetamine Leger directly accredited to McEntire was fifteen pounds.

Special Agent Kevin Martens ("Martens") of the Criminal Investigation Division of the Internal Revenue Service also testified at McEntire's sentencing hearings. He confirmed that two packages of methamphetamine, one from McEntire's courier in California and one which had been sent through the mail to one of McEntire's co-conspirators, had both been intercepted and analyzed. Those laboratory reports were entered as exhibits at the hearing. Agent Martens testified that the first report, Exhibit No. 1, was for 1,283.6 grams[5] seized from McEntire's

5. The mathematical conversion used by the government and the district court was:

courier at the airport in California. This mixture tested positive for methamphetamine but the report did not specify whether it was d-methamphetamine or l-methamphetamine. Martens stated he called the laboratory in California and was told the sample was d-methamphetamine. He also stated that other samples from other coconspirators had been seized and tested but none had ever tested positive for l-methamphetamine. Martens testified that Exhibit No. 2 was a lab report on two bags addressed to McEntire's courier which had been intercepted in the mail. The sample was 59% d-methamphetamine.

Agent Martens testified that one of McEntire's couriers had been cooperating with the government and had made twelve purchases of methamphetamine from McEntire, two of which were tested by the government. Those two laboratory reports were also entered as exhibits. Martens testified that Exhibit No. 3 was a laboratory report of a purchase made from McEntire in Missouri on October 15, 1994. The report indicated it was 35% d-methamphetamine. Martens also testified that Exhibit No. 4 was a report on another sample purchased from McEntire in Missouri on October 19, 1994, which was 40% d-methamphetamine.

Agent Martens corroborated Leger's testimony and Skaggs' testimony as to one of the $30,000 payments made by McEntire to Skaggs. Martens provided information given by another individual who had worked as a seller for McEntire and sold approximately ten pounds of methamphetamine during his dealings with McEntire. Martens also stated that one of McEntire's ex-girlfriends had observed at least twenty to twenty-five occasions when McEntire purchased methamphetamine or gave cash to Skaggs, involving amounts ranging from six ounces to four pounds. This girlfriend told Martens that she had seen McEntire give Skaggs $50,000 in cash on one occasion.

1 pound = 453.6 grams
2.2 pounds = 1 kilogram

**6.** There was some confusion as to whether the Las Vegas amount was three pounds or four. The district court added four pounds.

At the sentencing hearing, McEntire again argued that his relevant conduct involved between 10 kilograms and 30 kilograms of methamphetamine.

After reviewing the evidence, the district court found that McEntire had been directly involved in methamphetamine transactions totaling fifteen pounds (based on Leger's testimony), the three-pound amount received in Las Vegas, and eighty pounds (testified to by Skaggs). The district court arrived at a total of 99 pounds,[6] adding in another pound to make 100 pounds, and sentenced McEntire at a base offense level of 38.[7] Deducting three levels for assuming responsibility, the base offense level was fixed at 35, with a criminal history category of V, which ranged from 262 to 327 months. The court sentenced McEntire to 262 months.

McEntire argues that the government did not show with any certainty that the methamphetamine was d-methamphetamine and that the district court erred in calculating the amount of methamphetamine due to contradictory evidence and evidence incredible as a matter of law.

**B. Wilkins' Sentencing Hearing**

A sentencing hearing was held for Wilkins on November 15, 1996. Special Agent Kevin McDermott of the Drug Enforcement Agency ("DEA") testified that, in his experience of more than nine years with the DEA and in his position as a member of the clandestine drug labs investigatory team, l-methamphetamine was "not an effective methamphetamine as far as sales on the street" because it does not give the desired "rush or euphoria" that comes from d-methamphetamine. He also testified that producers of l-methamphetamine would not have repeat customers.

At Wilkins' hearing, the government also submitted the affidavit of a DEA forensic chemist. The affidavit stated that a major part of the chemist's job was to analyze mixtures seized by the DEA to determine if

**7.** Under the 1994 U.S.S.G. § 2D1.1(c) Drug Quantity Table, Base Offense Level 38 is "[a]t least 30 KG or more of Methamphetamine...."

they contained controlled substances. The affidavit also stated that methamphetamine exists in two isomer forms known as d-methamphetamine and l-methamphetamine and that the two forms are identical except for the fact that they are mirror images of each other. The affidavit stated that the only difference which resulted from this alteration was that d-methamphetamine has a pronounced physiological effect but l-methamphetamine has little physiological effect and, therefore, has less value on the "black market." The affidavit also stated that in 10,710 cases dating from January 1, 1980 to May 15, 1996, involving 37,752 separate samples analyzed by DEA chemists, only 26 samples were found to contain only l-methamphetamine, representing .07% of all samples analyzed.

Special Agent Martens also testified at Wilkins' sentencing hearing. He testified that six laboratory reports on methamphetamine seized from various co-conspirators all tested positive, in differing purities, for d-methamphetamine. He also testified that one of the reports, on a 1,283.6 gram seizure, indicated the mixture or substance contained methamphetamine but did not specify what type. He stated he called the crime lab and was informed that further testing had revealed the mixture was d-methamphetamine.

Agent Martens also testified concerning other codefendants' statements as to the number of drug transactions and amounts in which Wilkins was involved. The first occurrence was in October or November of 1992 in Las Vegas when Wilkins accompanied Don and Sherie Skaggs, Randy McEntire and Shawna Kincaid (McEntire's girlfriend) to pick up approximately four pounds of methamphetamine. The second incident was in September of 1993, when Sherie Skaggs picked up approximately three pounds of methamphetamine which was later split between co-conspirators Brian Skaggs, McEntire, and Wilkins. Agent Martens testified

that Sherie Skaggs had stated that Wilkins knew about the entire quantity, how it was being obtained, and that it was to be distributed between Brian Skaggs, McEntire, and Wilkins. The third transaction was in October of 1993, when Sherie Skaggs picked up two pounds of methamphetamine which again was to be split between Brian Skaggs, McEntire, and Wilkins. Again, testimony was presented that Wilkins knew about the entire amount, how it was being obtained, and how it would be distributed. The fourth occasion was in March of 1994, when a twelve-pound shipment of methamphetamine was received at the Skaggses' residence. Wilkins reportedly picked up the twelve pounds from the home and took it to a warehouse in St. Louis. The fifth incident was in June of 1994, when a shipment came in and was stored by Wilkins. There was conflicting testimony as to the amount of this shipment, varying from three pounds to one and one-half pounds. The district court used the one and one-half pound estimate. The sixth transaction was detailed in a proffer made by Bradley Leger, another codefendant. Leger stated that on one occasion he delivered approximately two pounds of methamphetamine mixture to Wilkins in Las Vegas. The district court then calculated that the amounts for the six transactions were 1.81 kilograms, 1.36 kilograms, 0.9 kilograms, 5.44 kilograms, 0.68 kilograms, and 0.9 kilograms, for a total of 11.09 kilograms of a mixture or substance containing methamphetamine.

With a total of 11.09 kilograms [8] of methamphetamine, the base offense level was 36.[9] The district court deducted three levels for assuming responsibility, and fixed the base offense level at 33, with a criminal history category of II, which ranged from 151 to 181 months. The court sentenced Wilkins to 151 months.

Wilkins argues that the government did not show with any certainty that the meth-

---

8. While the district court speculated that, even if the last transaction were to be subtracted and the total amount would be reduced to 10.6 kilograms, the amount still remained above the 10 kilogram minimum. However, the court specifically noted the amount as to relevant conduct was 11.09 kilograms. Wilkins mistakenly argued

that the relevant conduct amount was 10.6 kilograms.

9. Under the 1994 U.S.S.G. § 2D1.1(c) Drug Quantity Table, Base Offense Level 36 is "[a]t least 10 KG but less than 30 KG of Methamphetamine...."

amphetamine was d-methamphetamine and that the district court erred in arriving at the quantity of drugs attributed to him. He asserts that approximate amounts, combined with the "principles of lenity," should have been re-calculated to place the total amount at a lower level.

## II. ANALYSIS

### A. Standard of Review

■ In reviewing a district court's sentencing determination, we review the findings of fact underlying the application of the sentencing guidelines for clear error. *United States v. Villarreal*, 977 F.2d 1077, 1080 (7th Cir.1992); *see also* 18 U.S.C. § 3742(e) (reviewing courts "shall accept the findings of fact of the district court unless they are clearly erroneous"). Findings of fact are clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see United States v. Duarte*, 950 F.2d 1255, 1262 (7th Cir.1991). Congress has mandated this deferential standard of review, *see* 18 U.S.C. § 3742(e),[10] and we do not second-guess the sentencing judge. *United States v. Garcia*, 66 F.3d 851, 856 (7th Cir. 1995) (citing *United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir.1993)).

### B. Type of Methamphetamine

Although this circuit has not previously addressed the issue of determining the type of methamphetamine for sentencing purposes, there is relevant precedent from other circuits that discusses this matter at length.

The drug methamphetamine exists in two isomeric forms, and the isomers have profoundly different effects. *United States v. Dudden*, 65 F.3d 1461, 1470 (9th Cir.1995). The isomer levo-methamphetamine ("l-methamphetamine") produces little or no physiological effect when ingested. *Id.* Dextro-

methamphetamine ("d-methamphetamine"), however, produces a profound physiological effect, creating the high desired by the drug's users. *Id.* The two types of methamphetamine have the same chemical formula but different structural formulas; one has street value while the other has no value. *See United States v. Scrivner*, 114 F.3d 964, 966 (9th Cir.1997); *United States v. Bogusz*, 43 F.3d 82, 88 (3rd Cir.1994). Producers, suppliers, and users of methamphetamine want to obtain d-methamphetamine, not l-methamphetamine, because the latter form has little or no physiological effect and is worthless. *Reece v. United States*, 119 F.3d 1462, 1468–69 (11th Cir.1997) (noting that the chemical, physiological, and "street value" differences of d and l-methamphetamine have been repeated in numerous circuit cases and are also recognized in scientific texts and by the Sentencing Commission, the Drug Enforcement Agency, and the National Institute on Drug Abuse); *see also Scrivner*, 114 F.3d at 966.

Originally, the Sentencing Guidelines treated d-methamphetamine more severely than l-methamphetamine. *See* U.S.S.G. § 2D1.1 cmt. n. 10 (Drug Equivalency Tables) (Nov. 1, 1994). One gram of l-methamphetamine was equivalent to forty grams of marijuana, while one gram of d-methamphetamine was equivalent to one kilogram of marijuana. *Id.* Therefore, a defendant's sentence varied significantly depending on which variety of methamphetamine was involved. *Id.* at § 2D1.1. The Sentencing Guidelines soon reflected a better understanding of methamphetamine when they were amended in 1995 by eliminating any distinction between l-methamphetamine and d-methamphetamine. *See* U.S.S.G. § 2D1.1 (Nov. 1, 1995). Amendment 518 explains that the change was made because l-methamphetamine "is rarely seen and is not made intentionally, but rather results from a botched attempt to produce d-methamphetamine." U.S.S.G.App. C, Amendment 518 at 423 (Nov. 1, 1995).

10. *18 U.S.C. § 3742(e) states:*
[T]he court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall ac-
cept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.

McEntire and Wilkins argue that the district court erred in finding that all of the methamphetamine attributed to each over the course of the conspiracy was d-methamphetamine when the samples tested were all seized during the final six months prior to the end of the conspiracy.

The government bears the burden of proving, by a preponderance of the evidence, what type of methamphetamine was involved in an offense. *United States v. McMullen*, 86 F.3d 135, 138 (8th Cir.1996); *Dudden*, 65 F.3d at 1471–72; *Bogusz*, 43 F.3d at 88; *United States v. Deninno*, 29 F.3d 572, 580 (10th Cir.1994) (citing to *McMillan v. Pennsylvania*, 477 U.S. 79, 85, 106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986)). At sentencing, the government must prove that the methamphetamine attributed to the defendant is more likely than not d-methamphetamine. *United States v. Patrick*, 983 F.2d 206, 208 (11th Cir.1993).

In *Bogusz*,[11] the Third Circuit held that the government may meet its burden by presenting either chemical analysis, expert testimony, or circumstantial evidence that d-methamphetamine was the subject of the crime. 43 F.3d at 91–92. The court in *Bogusz* also noted that "[t]he inapplicability of the prohibition against hearsay to sentencing proceedings should facilitate the production of evidence in the form of expert opinion." *Id.* at 92 n. 17.

The Ninth Circuit in *United States v. Dudden* stated that where there is no direct evidence of the drug's chemical composition nor is the method of its manufacture known, circumstantial evidence may be sufficient to determine which isomer is involved. 65 F.3d at 1464; *see Bogusz*, 43 F.3d at 91–92 & n. 17 (finding that circumstantial evidence may be sufficient for preponderance of evidence where no chemical analysis performed); *United States v. Jennings*, 12 F.3d 836, 838 (8th Cir.1994) (finding no clear error that all methamphetamine was d-methamphetamine

when eight samples attributed to defendant tested as d-methamphetamine). The defendant in *Dudden* had been convicted for conspiracy to distribute methamphetamine in a "no dope" case, where no methamphetamine is ever recovered directly from the defendant, nor is the laboratory where the drug was manufactured ever located, nor is there any evidence of production materials or method. 65 F.3d at 1464, 1470. The only proof submitted by the government at the sentencing hearing was two affidavits of DEA forensic scientists prepared for sentencing in a different case. *Id.* at 1471 (emphasis added). The government presented no direct or circumstantial evidence beyond the two affidavits stating that the two scientists had never analyzed any samples of pure l-methamphetamine in the course of their testing for the DEA, in order to support a finding that the drug was d-methamphetamine. *Id.* The court held that it was clear error to find that the drug was d-methamphetamine, *id.* at 1472, and required proof to justify the added deprivation of liberty that occurs when the drug is d-methamphetamine. *Id.* at 1471 (citing *United States v. Patrick*, 983 F.2d 206, 209 (11th Cir.1993)); see also *United States v. Ramsdale*, 61 F.3d 825, 832 (11th Cir.1995) (finding plain error to sentence defendants for conspiracy to manufacture d-methamphetamine when no evidence introduced as to type of methamphetamine); *United States v. Wessels*, 12 F.3d 746, 754 (8th Cir.1993) (remanding sentence for further findings when district court took judicial notice that drug was d-methamphetamine based on court's own experience that none of its many methamphetamine cases involved l-methamphetamine).

The Tenth Circuit has also found that circumstantial evidence alone may be sufficient to meet the preponderance of the evidence standard. *United States v. Lande*, 40 F.3d 329, 331 (10th Cir.1994).[12] *Lande* was another "no dope" case. *Id.* at 330. The Tenth Circuit held that the affidavits of two DEA

---

11. Bogusz and co-defendant O'Rourke were sentenced under the 1991 Sentencing Guidelines, differentiating sentences for d-methamphetamine and l-methamphetamine in the same manner as the 1994 Sentencing Guidelines. *See Bogusz*, 43 F.3d at 84 n. 2.

12. Lande was sentenced under the 1994 Sentencing Guidelines. *See Lande*, 40 F.3d at 329.

senior forensic chemists (which discussed the fact that neither chemist had ever encountered l-methamphetamine in sixteen and ten years, respectively, of drug testing and the fact that l-methamphetamine had no stimulating effects), combined with testimony of a co-conspirator who stated that, after personal use of the methamphetamine the conspiracy dealt in, he would "stay up for two to three days," was sufficient evidence to determine that the district court was not clearly erroneous in concluding by a preponderance of the evidence that the methamphetamine involved in the offense was d-methamphetamine. *Id.* at 330–31.

In another Ninth Circuit case challenging the type of methamphetamine, the court noted:

> There was evidence that the defendants made large sums of money from their illegal drug operation, and that the methamphetamine which they manufactured was being sold on the street. Because l-methamphetamine produces little or no physiological effect, it would not stand to reason that defendants were selling large amounts of l-methamphetamine on the street for a profit.

*Scrivner*, 114 F.3d at 968–69. The court found it was not plain error to sentence the defendants based on d-methamphetamine under the 1994 Sentencing Guidelines without making a factual finding to classify the methamphetamine when the defendants did not raise the d- versus l-methamphetamine issue before the district court. *Id.* at 966, 968.

In *United States v. Jones*, 80 F.3d 436, 439 (10th Cir.1996), another "no dope" case, no drugs were ever seized from the defendant. However, samples had been seized from the seller who regularly supplied the defendant with methamphetamine. *Id.* Those samples were tested and found to be d-methamphetamine. *Id.* There was no evidence that either the defendant or the seller ever possessed l-methamphetamine. *Id.* The Tenth Circuit held the district court did not clearly

err in attributing d-methamphetamine to the defendant, even though the defendant was being charged with purchasing a weekly fixed amount over a six-month period.[13]

In *Reece v. United States*, 119 F.3d 1462, 1470–71 (11th Cir.1997), the defendant sought to vacate his sentences for convictions of conspiracy to distribute methamphetamine, distribution of methamphetamine, and possession of methamphetamine, arguing ineffective assistance of counsel because on direct appeal his attorney failed to request that the Eleventh Circuit notice plain error based on the district court's application of the d-methamphetamine guideline.[14] In order to determine if the attorney's performance actually prejudiced the defendant's case, the Eleventh Circuit examined the evidence as to the type of methamphetamine presented at the sentencing hearing, which consisted of three samples. *Id.* at 1470. The samples were obtained from defendant's co-conspirator and distributor, and were purchased on two separate occasions approximately two weeks apart. *Id.* The samples were analyzed and proved to be d-methamphetamine. *Id.* With this direct evidence, and after taking into account the fact that the Sentencing Commission, the Drug Enforcement Agency, and the National Institute on Drug Abuse had determined that d-methamphetamine is always the desired end product, the court found there was no doubt all of the methamphetamine was d-methamphetamine. *Id.* at 1468–70. The court noted that defendant sought to

> possess[ ] and, through [his associate], distribute[ ] a form of methamphetamine that had street value—that is, the drug was d-methamphetamine. To reach a contrary conclusion would require us to find that [defendant] made a conscious decision to distribute a worthless substance. We decline to accept an explanation for [defendant]'s criminal behavior that ignores the evidence before the district court, disregards the basic information about the drug, and defies common sense. We thus

---

**13.** Jones was sentenced under the 1994 Sentencing Guidelines. *See Jones,* 80 F.3d at 439.

**14.** Reece was sentenced under the 1993 Sentencing Guidelines, which contained the same dis-

tinctions as to d-methamphetamine and l-methamphetamine as the 1994 Sentencing Guidelines. *See Reece,* 119 F.3d at 1463–64.

conclude that there could have been no dispute in this case that the methamphetamine [defendant] possessed and distributed was the d-type.

*Id.*

Defendants argue that because there was no evidence as to where the methamphetamine involved throughout the conspiracy was produced, nor was there evidence as to what laboratories produced the methamphetamine or as to what chemicals were involved to produce it, nor was there any evidence as to which individuals produced the methamphetamine, it cannot all be classified as d-methamphetamine. Defendants maintain that without this evidence, the district court should have sentenced as if all the methamphetamine was l-methamphetamine. As is clear from the previous cases, evidence of the laboratory, the chemicals, and the individuals producing the methamphetamine is not necessary in order for the district court to find that all of the methamphetamine attributed to a defendant is d-methamphetamine.

Defendants also assert that because the samples of methamphetamine tested varied in purity, this indicates that those samples may have come from different batches of methamphetamine. McEntire argues that because there was a time lapse of nearly two years from the beginning of the conspiracy to the time when the samples were seized and tested "makes it very unlikely that the methamphetamine distributed prior to the seizures were part of any same parcel," as was the case in *United States v. Koonce*, 884 F.2d 349 (8th Cir.1989) (holding that, with only one sample seized and tested as d-methamphetamine, trial court did not err in finding it more likely than not that all of the methamphetamine involved was d-methamphetamine where defense never raised the l-methamphetamine issue at trial but only at sentencing hearing). We find these arguments unpersuasive. Despite the variances in purity, all of the samples tested positive for d-methamphetamine. Even if the methamphetamine came from different sources, there was sufficient evidence for the district court to find that this was a conspiracy dealing in d-methamphetamine.

Although the government failed to present an affidavit from a forensic expert at McEntire's sentencing hearing, as it did for Wilkins, the demand for d-methamphetamine, and the lack thereof for l-methamphetamine, has been noted by many other circuits and discussed in the Guidelines. McEntire stretches credulity to have us believe that he was involved in the sale of an ineffective product such as l-methamphetamine for any length of time, much less for more than two years, or that he was paying anywhere from $10,000 to $30,000 for a product for which there is no demand and that has no resale value.

We also call into question the statement in defendants' brief that "no methamphetamine was seized from either defendant, and no direct link was made between tested methamphetamine and the defendants." Two of the methamphetamine samples which were analyzed and presented by the government were purchased directly from McEntire. Two other samples were seized from couriers working for McEntire. Although none of the drugs were seized directly from Wilkins, he admitted to being an active member of the conspiracy and, as we have stated, there was sufficient evidence to find the conspiracy dealt in d-methamphetamine.

Following the reasoning of the courts in *Bogusz, Dudden, Lande, Reece, Scrivner,* and *Jennings,* we conclude that the government presented sufficient evidence, both circumstantial and direct, and we cannot say the district court clearly erred in finding that all of the methamphetamine in which McEntire and Wilkins dealt was d-methamphetamine.

**C. Quantity of Methamphetamine**

The base offense level for participation in a conspiracy to distribute methamphetamine depends on the quantity of the drug involved in the crime. U.S.S.G. § 2D1.1(a)(3). In calculating a defendant's base offense level under the Guidelines, the sentencing court must consider types and quantities of drugs that were "part of the same course of conduct or common scheme or plan." *United States v. Beler,* 20 F.3d 1428, 1431 (7th Cir.1994). "The defendant

need not have been either charged with or convicted of carrying out these other acts." *Id.* (citation omitted). This "relevant conduct" or "aggregation" rule provides the government tremendous leverage in drug cases. *Id.* (citation omitted). The government's burden at sentencing is further eased by the fact that the Federal Rules of Evidence do not apply, and the court is thus free to consider a wide range of information, including hearsay evidence, that may have been inadmissible at the defendant's trial. *Id.* at 1432 (citations omitted). We have applied this rule in a long line of cases. *Id.; see United States v. Montgomery,* 14 F.3d 1189, 1196–98 (7th Cir.1994); *United States v. Rivera,* 6 F.3d 431, 445 (7th Cir.1993); *United States v. Cedano–Rojas,* 999 F.2d 1175, 1179 (7th Cir.1993); *United States v. Thomas,* 969 F.2d 352, 355–56 (7th Cir.1992). This rule, however, is not without limits, *Beler,* 20 F.3d at 1432, and a related limitation is that the government must prove a defendant's additional conduct by *reliable evidence. Id.* (emphasis in original). The Guidelines reflect this concern.

> In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

U.S.S.G. § 6A1.3(a).

■ We will uphold a sentence pursuant to the Guidelines if the Guidelines were properly applied to factual conclusions that are not clearly erroneous and review for clear error a district court's determination of the quantity of drugs involved in an offense. *United States v. Soria,* 965 F.2d 436, 442 (7th Cir.1992) (citation omitted). Unreliable allegations must not be considered. U.S.S.G. § 6A1.3 cmt.; *see also Beler,* 20 F.3d at 1433.

■ We have also held that because the quantity of drugs is so important to sentencing in drug cases, "the court must make an

explicit finding as to the drug quantity and offense level and how it arrived at the sentence." *United States v. DePriest,* 6 F.3d 1201, 1213 (7th Cir.1993) (citation omitted). The sentencing court "should state reasons why each individual defendant was aware of or reasonably foresaw the particular amount of drugs for which he will be held accountable, with reference to supporting evidence." *Id.* (citations omitted).

### 1. *McEntire*

■ The district court found that McEntire had been directly involved in methamphetamine transactions totaling fifteen pounds (based on Leger's testimony), eighty pounds (testified to by Skaggs), and another three-pound transfer (the Las Vegas purchase with the Skaggses), resulting in a total of 100 pounds [15] and a base offense level of 38 for trafficking in excess of 30 kilograms of methamphetamine.

McEntire argues that the district court erred in calculating the amount of methamphetamine because the testimony of Don Skaggs was incredible as a matter of law, in addition to being unbelievable and contradictory.

■ We have held that a sentencing court may consider all evidence and the sentencing court shall judge the credibility of the witnesses and weigh the evidence. *See Villarreal,* 977 F.2d at 1081. For a witness's testimony to be held incredible as a matter of law, "it must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989); *see United States v. Henderson,* 58 F.3d 1145, 1149 (7th Cir.1995). Discrepancies arising from impeachment, inconsistent prior statements, or the existence of a motive do not render witness testimony legally incredible. *United States v. Clark,* 989 F.2d 1490, 1501 (7th Cir.1993). McEntire

---

**15.** The district court totaled 99 pounds, see infra n. 6, and then stated, "I am sure we can find another pound somewhere without any difficulty," in order to arrive at 100 pounds. Due to the

serious deprivations resulting from relevant conduct, we re-emphasize the importance of determinations based on evidence and reasoned analysis, not mere arbitrary pronouncements.

claims that Skaggs' testimony concerning the first seven drug deals Skaggs did with McEntire was incredible as a matter of law because it would have been "physically impossible." Skaggs testified that he did several deals, approximately every two weeks, from the time McEntire was released from the state penitentiary on May 11, 1992, up to July 4, 1992. Defense sought to enumerate these deals and totaled seven. McEntire argues it would be physically impossible to do seven deals, each two weeks apart, from May 11th to July 4th. However, Skaggs was giving approximations. While it is true he testified that the deals were every two weeks, he also stated they were "sometimes twice a week." We cannot find that Skaggs' testimony was sufficiently detailed to indicate seven drug deals occurred exactly two weeks apart between May 11th to July 4th. Therefore, we cannot find the testimony in-credible as a matter of law.

McEntire also argues that Skaggs' testimony as to the amount of methamphetamine McEntire received is contradictory. Although we have held that a district court is entitled to credit testimony that "is totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant," *Garcia*, 66 F.3d at 857 (citing *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir.1989)); *see also Soria*, 965 F.2d at 442–43, there must be "sufficient indicia of reliability." U.S.S.G. § 6A1.3(a); see also *Beler*, 20 F.3d at 1432.

■ We have held that where there is inconsistent evidence, the district court must conduct a sufficiently searching inquiry into the government's evidence to ensure its probable accuracy. *Beler*, 20 F.3d at 1433. In *Beler*, the district court relied on two affidavits from a government witness and the trial testimony of a second witness to support a relevant conduct finding as to drug quantity. *Id.* at 1430. The first affidavit stated that the witness had purchased approximately 150 to 200 ounces of cocaine from the defendant. *Id.* The witness later testified at defendant's trial that he was unable to estimate the quantity of cocaine he had purchased from the defendant over the years. *Id.* The same witness later submitted a sec-

ond affidavit stating that the amount in the first affidavit was incorrect and should have been 15 to 20 ounces of cocaine. *Id.* The district court credited the 15 to 20 ounces amount in the second affidavit. *Id.* We held that section 6A1.3(a)'s reliability standard must be rigorously applied. *Id.* at 1433. We noted that "although [defendant] failed to come forward with his own alternative estimate of drug quantity, he did succeed in discrediting [the witness]'s estimate by pointing to [witness]'s inability to make a similar estimate of drug quantity at trial." *Id.* "Because the affidavits offered only bare estimates with no explanation of how [witness] may have arrived at those figures, we think Beler's reliance on the [witness's] trial testimony was sufficient to raise a question about the reliability of [witness]'s affidavits." *Id.* at 1433–34. We found the district court's conclusory finding as to the reliability of the second affidavit was not acceptable. *Id.* at 1433. We held that the district court should have further explored the factual basis for the estimate before accepting the amount as uncontroverted. *Id.* at 1434.

In addition, the witness in *Beler* was a drug addict during most, if not all, of the relevant time period. *Beler*, 20 F.3d at 1435. He admitted that his drug use had been heavy for approximately six years during his dealings with the defendant. *Id.* While he explained his inability to estimate the quantity at defendant's trial, he was able to provide an estimate post-trial in the affidavits. *Id.* In these circumstances,

> [W]e believe the district court should have subjected any information provided by [the witness] to special scrutiny in light of his dual status as a cocaine addict and government informant. Such a heightened standard of scrutiny is consistent with the rule adopted by a number of other circuits when considering a drug quantity estimate provided by an informant who has a history of drug addiction.

*Id.* (citing to *United States v. Miele*, 989 F.2d 659, 666–67 (3rd Cir.1993) (holding that district court should scrutinize drug quantities or other precise information provided by addict-informant before basing a sentencing determination on that information)); *see also*

*United States v. Simmons*, 964 F.2d 763, 776 (8th Cir.1992) (rejecting drug quantity testimony of informant who had lied under oath at trial and whose memory was impaired by "a history of cocaine addiction"); *United States v. Robison*, 904 F.2d 365, 371–72 (6th Cir.1990) (rejecting drug-quantity estimate of heavy drug user who admitted that relevant time period was "very hazy" due to drug use). In *Beler*, we found that the district court, in light of the inconsistencies in the evidence, clearly erred when it did not subject the affidavits to "the searching scrutiny we must require. . . ." *Beler*, 20 F.3d at 1435. However, we did note that the rejection of the witness's drug quantity estimate did not bar the witness from providing drug quantity information on remand, but "we must require that the district court scrutinize that information to ensure that it possesses 'sufficient indicia of reliability to support its probable accuracy.'" *Id.* (citing U.S.S.G. § 6A1.3(a)). We held that a hearing would aid the district court's resolution of the disputed issue on remand. *Id.* (citations omitted). We note that at the sentencing hearing, Skaggs admitted that he used "a lot" of methamphetamine and that it sometimes affected his memory. In addition, Skaggs admitted that he had lied on other occasions in order to benefit himself.

■■■■ We also look to *United States v. Duarte*, 950 F.2d 1255, 1266 (7th Cir.1991), where we held that when a sentencing court "relies upon one of two contradictory statements offered by a single witness, it should directly address the contradiction and explain why it credits one statement rather than the other." In the instant case, Skaggs has made several conclusory estimates but has not supported the estimates with any further explanations or details as to how he arrived at the amounts. While we ordinarily defer to the district court's judgment when it must choose between one of two inconsistent statements of fact in imposing sentence, we believe the *Duarte* holding applies here, where the district court relies on contradictory statements given by the same witness.

The district court relied on Skaggs' testimony and adopted the lower number of the 80–to–100-pounds estimate. However, this was one of four different estimates given by Skaggs. In his proffer, Skaggs stated McEntire received 50 pounds of methamphetamine. He then testified at trial that McEntire received 80 to 100 pounds of methamphetamine. Next came the affidavit disavowing any ability to estimate the amount of methamphetamine McEntire received. Then at the sentencing hearing, Skaggs stated McEntire received much more than 80 to 100 pounds. The district court did not explain why the 80–to–100-pound testimony was credited over the other varying statements.

The record in this case leaves us unconvinced that the district court conducted a sufficiently searching inquiry into the contradictory evidence. Skaggs' testimony was uncorroborated and the district court did not provide a rationale for believing one set of contradictory statements over another. The sentence imposed on the basis of that evidence, therefore, cannot stand. Under the above-stated criteria, we must find for McEntire and remand the case for re-sentencing as to the relevant conduct based on the quantity of methamphetamine.

### 2. *Wilkins*

The district court attributed 11.09 kilograms of methamphetamine to Wilkins, placing his relevant conduct in excess of 10 kilograms and mandating a base offense level of 36.

Wilkins argues that he received less than 10 pounds of methamphetamine, which would place his relevant conduct in excess of 3 kilograms but less than 10 kilograms, resulting in a base offense level of 34, if the drug involved was d-methamphetamine.

■■■■ A sentencing court may consider all evidence presented at trial, even though testimony may arguably be vague and incredible. *Villarreal*, 977 F.2d at 1081 (citing to *United States v. Soria*, 965 F.2d 436, 442–43 (7th Cir.1992) (finding sentencing court did not err in relying on testimony of witness who testified as part of his plea agreement, admitted to lying at his sentencing, and whose testimony differed significantly from previous accounts to police)).

■ Although the witnesses at Wilkins' sentencing hearing provided estimates and not precise figures as to the amounts of methamphetamine involved, we have held that reliance on such estimates is an appropriate way for the district court to determine the quantity of drugs involved in an offense. *Garcia*, 66 F.3d at 859; *Duarte*, 950 F.2d at 1265 (noting that as long as "nebulous eyeballing" is avoided, "factual determination under the Guidelines need not emulate the precision of Newtonian physics").

■ The district court relied on evidence of transactions only in which Wilkins was personally involved. The evidence concerning Wilkins' involvement was not based upon mere allegations but was surrounded by reliability factors, i.e., dates, locations, amounts, others involved, course of conduct, etc. Under the relevant conduct provision of the Guidelines, a defendant acting in concert with others may be sentenced on the basis of drug quantities that he did not handle personally. U.S.S.G. § 1B1.3(a)(1)(A) & cmt. Application Notes(a)(1). The Seventh Circuit holds a conspirator responsible for the amount of drugs that individual conspirator actually distributes, as well as for any quantity distributed by the conspiracy that was reasonably foreseeable to the conspirator. *United States v. Jarrett*, 133 F.3d 519, 531 (7th Cir.1998) (citations omitted), *cert. denied, Jarrett v. United States*, —— U.S. ——, 118 S.Ct. 1688, 140 L.Ed.2d 824 (1998). The government need not tie a conspirator to each transaction so long as the conspirator could reasonably foresee that the transactions would occur. *Id.* at 532. Therefore, the district court did not err in crediting the total amount of methamphetamine in transactions where Wilkins received only one-third of that total, as there was sufficient evidence in the record to indicate Wilkins knew of the total amount and the subsequent three-way split. In addition, where there was some discrepancy as to the amount, the district

court chose to err on the conservative side and credit the lowest amount. Calculating a total of 11.09 kilograms from six transactions, the district court correctly determined that the amount was more than 10 kilograms of methamphetamine, which mandates a base level of 36. We affirm the district court's findings set forth in the sentencing statement as to the amount of methamphetamine used to determine Wilkins' base offense level.

■ Wilkins argues that "following the principles of lenity," [16] the approximate amounts of methamphetamine should have been recalculated to lower amounts by the district court, thereby reducing his base level from 36 to 34. For this argument, Wilkins directs us to the holdings in *United States v. Howard*, 80 F.3d 1194 (7th Cir.1996) and *United States v. Garcia*, 66 F.3d 851 (7th Cir.1995). We presume that these references allude to the fact that in *Howard*, 80 F.3d at 1205, we held that quantities less than 0.1 grams could be calculated (and not always rounded upwards to a minimum of 0.1 grams), and in *Garcia*, 66 F.3d at 859, where we observed that the district court had "err[ed] on the side of being conservative with the amounts." Evidently, from these cases, Wilkins is extrapolating and advocating "principles of 'leniency,'" which would require a district court to find in favor of the defendant whenever there may be conflicting facts or issues. Wilkins is mistaken.

## III.  CONCLUSION

We find that the district court did not clearly err in finding that the government established by a preponderance of the evidence all of the methamphetamine involved in this conspiracy, as applied to McEntire and Wilkins, was d-methamphetamine. We therefore affirm McEntire and Wilkins' sentencing as to drug quality.

16. We note the distinction between Wilkins' "principles of lenity" and the "rule of lenity." In *United States v. Hopson*, 18 F.3d 465, 469 (7th Cir.1994), we stated that "[t]he rule of lenity dictates that when a statutory ambiguity cannot be resolved through standard methods of interpretation, the ambiguity should be resolved in favor of the criminal." In this case, the only possible involvement of the rule of lenity would be concerning any ambiguities in the language of the Guidelines. However, such is not the case here. Wilkins is challenging the district court's calculations of the quantity of drugs involved. The rule of lenity does not apply to the district court's application of the Sentencing Guidelines to the facts. See *id.*

In addition, we find that the district court did not clearly err in estimating the quantity of methamphetamine as to Wilkins' relevant conduct and that those estimates were based upon sufficiently reliable and uncontradicted evidence. We therefore affirm the district court's sentencing as to Wilkins' drug quantity.

However, we are unconvinced that the drug quantity estimates of Don Skaggs concerning the amounts attributed to McEntire are reliable. The district court's conclusory drug quantity estimates as to McEntire did not resolve the problem. While we are aware that by remanding for further fact finding and re-sentencing, we impose a burden on the district court, we cannot be satisfied with a conclusory factual finding based on potentially unreliable evidence, even though the original determination by the experienced district judge may prove to be correct on remand. We therefore vacate McEntire's sentence as to the quantity and remand for re-sentencing consistent with this opinion. Circuit Rule 36 shall not apply.