**UNITED STATES of America,
Plaintiff,**

**v.**

**Thomas SIENKOWSKI, Defendant,**

**No. 01–CR–108.**

United States District Court,
E.D. Wisconsin.

March 19, 2003.

Carol Kraft, Stephanie Rothstein, Milwaukee, WI, for Plaintiff.

Michelle Roberts, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

Defendant Thomas Sienkowski was charged, along with five other members of the Outlaws Motorcycle Club, with racketeering and drug-related offenses. He entered a plea of guilty to one count of conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d), and a presentence report (PSR) was prepared in anticipation of sentencing.

According to the PSR, defendant's offense level under the sentencing guidelines was 33. The base offense level was computed under U.S.S.G. § 2E1.1(a)(2), which directs the court to examine the specific activity underlying the racketeering conspiracy. Each racketeering act should be treated as if it were a separate offense, and the adjusted level determined via application of the grouping rules of chapter 3 of the guidelines manual. U.S.S.G. § 2E1.1 cmt. n. 1.

In defendant's case, the indictment alleged seven racketeering acts—six conspiracies to commit murder and one act of distribution of controlled substances. The conspiracies to murder each carried a base offense level of 28 under U.S.S.G. § 2A1.5(a), and the drug distribution act a base level of 24 under U.S.S.G. § 2D1.1(c)(8). The combined offense level under § 3D1.4 was determined to be 33.

The PSR then recommended that defendant receive a three level enhancement under § 3B1.1(b) because he was a manager or supervisor of criminal activity involving more than five people. Finally, the PSR recommended a three level reduction for acceptance of responsibility under § 3E1.1. Therefore, the final offense level was 33.

■ Neither party objected to the guideline determinations in the PSR.[1] However, after reviewing the evidence I concluded that the three level enhancement under § 3B1.1 was not justified. In this decision I explain why.

1. Defendant did file a motion for a downward departure from his criminal history category under § 4A1.3, which I denied.

## I.

Section 3B1.1 provides for various offense level enhancements based on the defendant's aggravating role in the offense:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Application note 2 states: "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." Note 3 states: "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted. A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant."

■ It was undisputed that this conspiracy involved more than five people. The question was whether defendant managed or supervised other participants. Application note 4 explains:

In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed

right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

The government bears the burden of proving by a preponderance of the evidence that an enhancement under § 3B1.1 is warranted. *United States v. Joiner*, 183 F.3d 635, 644 (7th Cir.1999).

The evidence the government relied upon was essentially as follows. Defendant was vice-president of the Milwaukee chapter of the Outlaws during the time period covered by the indictment. In that capacity, he substituted for the president, Edward Anastas, and exercised all of the presidential powers when Anastas was absent. Anastas and other cooperating witnesses stated that defendant attended "bosses" meetings and was privy to discussions about the Outlaws "war" with the Hell's Angels and affiliated motorcycle gangs, and that he both assisted with that war and directed other members in Anastas's absence.[2] Defendant reportedly assisted in the planning of the racketeering acts in the indictment and directed the activities of others in carrying out those acts.

I found that the above evidence was insufficient to warrant application of the enhancement. First, application note 4 makes clear that titles are not controlling. Therefore, the fact that defendant was vice-president of his Outlaws chapter does not mean that he was a manager or super-

---

**2.** The six racketeering acts involving conspiracies to commit murder involved planned attacks on other motorcycle gangs and/or gang members.

visor under § 3B1.1. Even if that title gave him certain power in the absence of Anastas, the enhancement applies only to supervision of others in the commission of criminal conduct; it is insufficient that the defendant may have supervised or controlled other participants in their non-criminal activities. *See, e.g., United States v. DeGovanni*, 104 F.3d 43, 46 (3d Cir. 1997). Neither was it sufficient that defendant attended "bosses" meetings absent evidence that he occupied one of the roles specified in § 3B1.1.

Although the PSR made the general statement that defendant directed the activities of others in carrying out the predicate acts listed in the indictment, it never specified *who* he managed. I could not apply the enhancement without this information. *See United States v. Schweihs*, 971 F.2d 1302, 1318 (7th Cir.1992); *United States v. Jewel*, 947 F.2d 224, 236 (7th Cir.1991). In *United States v. Mansoori*, 304 F.3d 635, 668–69 (7th Cir.2002), the court stated that the district judge need not identify by *name* the participant the defendant directed, so "long as the court's findings and the underlying evidence make clear that the criminal enterprise involved at least five culpable participants and that the defendant actually did manage or supervise one or more of these individuals." Even under this loose standard, in reviewing each individual predicate act, I was unable to determine that defendant managed or supervised anyone. I considered each in turn.

- **Act One—Conspiracy to Murder Patrick Matter** [3]

It appeared that defendant's involvement in act one was limited to participation in two meetings at which the murder of Patrick Matter was discussed. There was no evidence that defendant di-

rected anyone to do anything. To the contrary, the PSR stated that Kevin O'Neill, who at the time was a chapter president, "directed Mr. [James] Schneider and Mr. [Randall] Miller to meet with Edward Anastas, to discuss the trip to Minneapolis." (PSR, ¶ 31.) Then, according to Schneider, "Mr. Anastas directed they were to kill a Hell's Angel if they got the opportunity." (PSR, ¶ 31.) Anastas gave money, a weapon, and surveillance notes to Scott Hammond, Schneider, and Miller, who traveled to Minneapolis but never "got a shot at" Matter. (PSR, ¶ 33.) Defendant directed no one regarding this act.

- **Act Two—Patrick Matter Truck Bomb Conspiracy**

This act involved another attempt to kill Matter, this time by placing a bomb under his truck. The PSR stated that the bomb was assembled at defendant's home and that defendant was there when his cohorts arrived to do the assembling, but there was no indication he supervised anyone in its construction. It appears that O'Neill was in charge of this operation.

- **Act Three—Conspiracy to Murder "Hell's Henchmen" in Rockford**

Act three involved an incident in which various Outlaws, including defendant, traveled to Rockford, Illinois in search of members of the Hell's Henchmen, whom they planned to shoot at while the Henchmen rode their motorcycles through the City. The PSR stated that "instructions were given by Kevin O'Neill." (PSR, ¶ 37.) There was no indication defendant managed or supervised anyone.[4]

---

**3.** Patrick Matter was president of the Hell's Angels in Minneapolis.

**4.** I also note that no shots were ever fired.

● Act Four—Conspiracy to Murder "Invaders" at the Illiana Speedway

Act four involved a plan to travel to the Illiana Speedway in Shereville, Indiana for the purpose of confronting the Invaders, another rival motorcyle gang. According to the PSR, Anastas was in charge of this operation. Defendant's role was to assist Hammond, who "supervised" a "fortified van" brought by the Milwaukee chapter of the Outlaws. There was no evidence defendant directed anyone in this matter.

● Act Five—Conspiracy to Bomb Hell's Henchmen Clubhouse

Act five involved a conspiracy to place a bomb outside the clubhouse of the Hell's Henchmen in Chicago. Defendant purchased explosives and provided them to Anastas and Alan Venus, who assembled the bomb. Defendant was also present at meetings where the plan to place and detonate the bomb was discussed. But, again, there was no indication that defendant managed or supervised anyone.

● Act Six—Conspiracy to Murder at the Morocco Speedway

Act six involved a conspiracy to confront and attack members of Hell's Angel's affiliated clubs at the Morocco Speedway in northern Indiana. Anastas directed the others in this operation. According to ¶ 51 of the PSR, he "put Mr. Hammond and Mr. Sienkowski in charge of 'security.' Security involved organizing a schedule for the various Outlaws participants to stand armed guard duty." But the PSR did not specify that defendant directed or supervised any identifiable person in the security operation or other criminal conduct.[5]

● Act Seven—Conspiracy to Distribute Controlled Substances

Finally, regarding act seven, there was no indication that defendant did anything more than sell marijuana to others. The mere fact that a person buys or sells drugs as part of a conspiracy is insufficient to support an aggravating role adjustment. *See, e.g., United States v. Mustread,* 42 F.3d 1097, 1104 (7th Cir.1994); *United States v. Evans,* 985 F.2d 497, 500 (10th Cir.1993).

Even considering the conspiracy as a whole, I could not conclude that the enhancement was proper under the standard set forth in application note 4. There was no evidence that defendant supervised or directed others in the "war" with rival motorcycle gangs. Defendant's participation in many of the specific acts was peripheral. He never detonated a bomb or fired a shot. There was no evidence that he recruited others to join the Outlaws, or that he claimed a larger share of the proceeds of the conspiracy's unlawful conduct. Finally, even if he was present at "bosses" meetings, there was no evidence that his level of participation at those meetings warranted an offense level enhancement.

Therefore, I found the evidence insufficient to support application of the enhancement. The corrected offense level was 30. Coupled with a criminal history category of II, the imprisonment range was 108–135 months. Considering all of the facts and circumstances, I sentenced defendant to 120 months in prison.[6]

**II.**

⬛ A final issue merits some discussion. In their plea agreement, the parties

---

5. There were vague references in ¶¶ 53 and 54 of the PSR to defendant being "in charge of security" at other events, but again no indication that he directed other participants.

6. Other conditions of the sentence appear in the judgment.

agreed to jointly recommend a three level enhancement under § 3B1.1(b). At sentencing, the government objected to my independent review of this issue. However, I am not bound by the parties' agreement in determining the proper application of the guidelines and must make my own determination in light of the evidence. *Cf. United States v. Milton,* 153 F.3d 891, 897 (8th Cir.1998) (imposing § 3B1.1 enhancement despite fact that government had agreed in plea agreement not to seek it). Indeed, the plea agreement itself stated:

> The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement.... The sentencing court will make its own determination regarding any and all issues relating to the application of the sentencing guidelines and may impose any sentence authorized by law ....

(R. 236 at 9, ¶ 22.)

■ The government also requested that sentencing be adjourned so that it could produce evidence in support of the enhancement, but I declined to do so. First, I was not convinced by the government's proffer that it, in fact, possessed such evidence. But more importantly, an adjournment under these circumstances would not have been appropriate given the prominence of the sentencing guideline determination in modern federal criminal practice. As Judge Weinstein recently stated:

> The virtual elimination of federal criminal trials, substituting administrative decisions not to prosecute or pleas of guilty, has substantially changed our federal criminal law system. Increased prosecutorial discretion and power have raised the percent of guilty pleas from 86% of all federal convictions in 1971 to 95% in 2001. Discretion not to prosecute is widely exercised. Enhancement of control of sentencing by the prosecutor as a result of sentencing guidelines and minimum sentences has increased the government's power to coerce defendants. There has been a change from the paradigmatic concept of investigation and accusation by the government of almost all persons believed to have committed crimes, trial by jury with a strong role for defense counsel, and discretion in sentencing by the court, to a system sharply reducing the role of defense counsel, the jury and the judge, and whatever protections they can afford a defendant.

*United States v. Speed Joyeros, S.A.,* 204 F.Supp.2d 412, 417–18 (E.D.N.Y.2002).

In *Speed Joyeros, S.A.,* Judge Weinstein was primarily concerned about the pressure this system places on defendants to plead guilty. But his observations are also pertinent to this case. Because federal criminal cases so rarely proceed to trial, the sentencing hearing is often the only proceeding at which the defendant and the judge may test the evidence. Moreover, because the sentencing guidelines are based on the theory of incremental punishment, evidentiary findings on issues that once may have been considered peripheral now have a profound impact on a defendant's sentence. In this case, for example, application of the § 3B1.1(b) enhancement would have resulted in a 43 month increase in the bottom of defendant's imprisonment range and 53 months at the top.

■ Although the sentencing hearing has essentially replaced the trial in modern federal criminal practice, the protections afforded defendants at sentencing lag far behind those available at trial. The government bears the burden of proof under the sentencing guidelines, but the standard is only a "preponderance of the evidence" rather than "beyond a reasonable doubt." *See, e.g., United States v. Miner,* 127 F.3d

610, 613 (7th Cir.1997).[7] The rules of evidence do not apply at sentencing, and the testimony need only have sufficient indicia of reliability in order to support a sentencing determination.[8] *See, e.g., United States v. McEntire,* 153 F.3d 424, 435 (7th Cir.1998); *United States v. Carmack,* 100 F.3d 1271, 1276 (7th Cir.1996); *United States v. Lanterman,* 76 F.3d 158, 160–61 (7th Cir.1996). Neither does the rule announced in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) afford defendants any protection under the sentencing guidelines (so long as the sentence is within the statutory maximum).[9] *See, e.g., United States v. Leonard,* 289 F.3d 984, 989 (7th Cir.), *cert. denied,* —— U.S. ——, 123 S.Ct. 331, 154 L.Ed.2d 227 (2002).

Despite all this (and also because of it), the district court must maintain its role in the sentencing process. It must carefully review the PSR to determine the appropriateness of the guideline determinations contained therein. It must hold the government to its burden. And it need not allow the government to, in essence, reopen the proceedings and submit additional evidence in support of an issue on which it bears the burden of proof after the court has found the evidence lacking. The government should submit to the pre-sentence writer the evidence it believes necessary to support the guideline determinations it

seeks. Having failed to do so, it cannot be heard to complain when the court makes findings based on the evidence (or lack thereof) in the record. A court need not sentence a defendant under a particular range just because the government, or the defendant, or both, say so.

---

7. *But cf. United States v. Ofcky,* 237 F.3d 904, 908 (7th Cir.2001) (discussing whether a higher standard might apply where an enhancement dramatically increases the sentence).

8. In a memorable passage (and one often repeated), the Seventh Circuit stated that "a district court is entitled to credit even testimony that is totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant." *United States v. Garcia,* 66 F.3d 851, 857 (7th Cir.1995) (internal quotation marks omitted).

9. As is now well-known, in *Apprendi* the Court held that any fact, other than the fact of a prior conviction, that increases the maximum punishment must be submitted to the jury and proven beyond a reasonable doubt. 530 U.S. at 490, 120 S.Ct. 2348. Of course, statutory maximums are almost always irrelevant in federal sentencing. The guidelines determine what the punishment will be. Yet the findings that support a sentence under the guidelines, even if those findings dramatically increase the imprisonment range, may be made by a judge alone and by a preponderance of the evidence.